UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Sulock Construction, LLC, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CertainTeed Corp., USG Corporation, United States Gypsum Company, New NGC, Inc., LaFarge North America Inc., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., PABCO Building Products, LLC,<br><br>Defendants. | Case No._____<br><br>COMPLAINT<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

This action is brought on behalf of Plaintiff and all others similar situated, to recover treble damages and other appropriate relief based on Defendants' unlawful conspiracy, from at least September 2011 to the present, to fix, raise, maintain and stabilize the price of gypsum board and to abolish the industry's competitive and long-standing practice of limiting price increases for the duration of a construction project through the use of "job quotes." The Defendants in this action, USG Corporation and United States Gypsum Company (collectively "USG"), New NGC, Inc., LaFarge North America Inc., Certain Teed Corp., Georgia-Pacific LLC, American Gypsum Company LLC, TIN Inc. d/b/a Temple-Inland Inc., and PABCO Building Products, LLC, manufacture and sell almost all of the gypsum board sold in the United States. As set forth below, Defendants' conspiracy violates the federal antitrust laws and, in particular, Section 1 of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act").

1

## INTRODUCTION

1.      Gypsum board – also known as drywall, wallboard, sheetrock or plasterboard – is used in over 90 percent of all new residential and commercial construction projects in the United States.  On average, a new home built in the United States contains more than 7.31 metric tons of gypsum.  Because of its sound-dampening, fire-retarding, and moisture-control qualities, gypsum board has no reasonably functional substitutes, thus enabling the manufacturer of gypsum board to control the market without fear that purchasers might turn to an alternate product.

2.      From at least September 2011 through the present, the Defendants, manufacturers of gypsum board, combined and conspired to fix and raise the prices at which they sold gypsum board in the United States beginning with large and coordinated price increases that all became effective on or about January 1 or 2, 2012.  In advance of these coordinated increases, during late September through mid-October 2011, five of the eight defendant manufacturers announced that they were raising gypsum board prices in January 2012 by an unprecedented 35% to their customers and indicated those prices increases would remain in place throughout 2012.  The remaining Defendants also issued price increase announcement letters or otherwise informed customers that they would be imposing substantial price increases, that those price increases would become effective on the same date, and that the price increases would have the same duration.  For example:

- On September 20, 2011, Defendant American Gypsum told customers nationwide that "Effective January 1, 2012, we will implement a 35% price increase on all gypsum wallboard products.  This increased price (up 35%) will be your price for the entire year 2012.  This increase applies to all segments of the business."

- On September 30, 2011, Defendant National Gypsum told customers nationwide that "National Gypsum Company will implement a price

2

increase of 35% on all wallboard products, to be effective on January 1, 2012. It is our intention that the resultant price (up 35%) will apply for all 2012."

- On October 3, 2012, Defendant CertainTeed (Saint-Gobain) wrote to inform its customers that they would receive a new price schedule on November 15 for "all wallboard products." CertainTeed subsequently told customers that "our price increase, intended to be in effect for the calendar 2012 year, will range between 35% and 37% for all gypsum wallboard products."

- On October 4, 2012, Defendant Lafarge North America Inc. informed its customers nationwide that "on Monday, January 2nd 2012 we will implement a 35% increase on all our wallboard products."

- On October 12, 2011, Defendant PABCO Gypsum told customers nationwide that "Effective January 1, 2012, PABCO Gypsum will implement a 35% price increase across all product lines. This increase will establish pricing for the calendar year 2012."

Defendants USG, Temple-Inland, Inc. and Georgia-Pacific LLC also communicated to customers that they would be imposing substantial price increases effective on January 1, 2012 and those increases would remain in place for the year.

3.     The 2011 price increase announcements were led by defendant American Gypsum, which had a small market share relative to industry leaders like defendants USG and New NGC, Inc.  Absent assurances and agreement that its "competitors" would follow, such "leadership" by a small player would have been contrary to American Gypsum's self interest given the market conditions described below. Because gypsum board is a commodity product, in the absence of collusion Defendants' price increases would have contravened each Defendant's independent self-interest, as anyone could have profited and gained market share by undercutting the others during a period where the Defendants had substantial unused capacity.

4.     Moreover, contrary to prior history in the industry, Defendants not only announced these coordinated price increases, they then successfully maintained much higher prices throughout 2012. These increases were imposed despite a soft construction market; *see*

3

¶¶ 74-76 below.  Defendants also maintained substantially higher prices in the face of significant industry overcapacity that would have made it virtually impossible for any Defendant independently to impose and maintain a substantial price increases on its customers in the absence of collusion.

5.      At virtually the same time, each of the Defendants also abruptly abolished its use of a decades-old competitive pricing practice known as job quotes.  This practice was used throughout the gypsum board industry and was a central component of each Defendant's business model.  Job quotes permitted customers to lock in the price of gypsum board for the entire course of a construction project. Notwithstanding the pivotal role this pricing model had historically played in the industry for more than four decades, each Defendant abruptly eliminated the practice in late 2011, at the same time that they put in place the industry-wide price increases described above.

6.      This dramatic change in a longstanding competitive pricing practice used by each of the Defendants was implemented, for example, in the following communications:

- On September 30, 2011, Defendant American Gypsum told its customers that "Effective immediately, we will no longer be providing job quotes."

- On September 28, 2011, Defendant USG told its customers that "USG will no longer offer job quotes and/or price protection on wallboard, effective immediately."  USG told customers that it would only adhere to job quotes "that have been committed to USG with a purchase order by October 15, 2011."

- On September 30, 2011, Defendant New NGC, Inc. ("National Gypsum") told its customers that "effective immediately, we will discontinue for all product lines the policy of providing job quotes."  National Gypsum stated that "[w]e will strictly enforce this policy and have set a date of October 14, 2011" by which customers had to verify any earlier job quotes.

- On October 3, 2012, Defendant CertainTeed (Saint-Gobain) told its customers that it was going to "cease all job quotes immediately."  Like its

4

> co-conspirators, CertainTeed told customers that with respect to outstanding job quotes, "we will require all <u>existing</u> projects to be confirmed with a firm purchaser order or written notice of intent by October 14, 2011. This policy will be strictly enforced."

- On October 4, 2012, Defendant Lafarge North America Inc. told its customers that "effective immediately, we will cease all job quotations." Like other co-conspirators, Lafarge told customers that "[a]s for outstanding job quotes, we will require all existing projects to be validated with a Letter of Intent signed by the dealer and successful contractor by not later than October 14, 2011. This policy will be strictly enforced."

- On October 12, 2011, Defendant PABCO Gypsum told its customers nationwide that "Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes. All previously committed quotes [i.e., all quotes prior to October 12, 2012] will be honored and must be validated in writing[.]"

Each of the remaining Defendants communicated to its customers at or near this time that it was abolishing job quotes effective immediately.

7.     Prior to this abrupt change in the longstanding industry practice, the "job quote" policy protected the Defendants' customers from price increases occurring during their respective construction projects or "jobs" by allowing Defendants to lock in the prices for gypsum board (sometimes with specified price increases allowed) at the beginning of the project. It also provided a mechanism for price competition between manufacturers. But the collusive change in the industry pricing model shifted that risk of future price increases squarely to customers and was expressly designed to allow Defendants to profit from both this and any future price increases. A research analyst who follows the industry stated succinctly: "the elimination of job quotes paves the way for a meaningful price increase. That, in a nutshell, is the story."

8.     Moreover, the elimination of competitive job quotes facilitated collusion because it made pricing more consistent throughout the industry and thus allowed Defendants to more

easily monitor and detect cheating from the conspiracy. Prior to the elimination of job quotes, as much as 70 percent of all gypsum board was sold pursuant to a job quote. If job quotes had remained in place, a Defendant's failure to implement collusive price increases would not necessarily mean defection from a conspiracy, but could simply be pricing consistent with the job quote practice. With the practice eliminated, however, any failure to impose price increases on customers would be more readily recognized by co-conspirators as cheating. Thus, by collusively eliminating the job quote policy, Defendants not only ensured more immediate and consistent implementation of their conspiratorial 2012 price increase, but facilitated the monitoring of the conspiracy.

9.      The job quote pricing model had been a well-ingrained industry practice for over four decades and purchasers received this price protection for a substantial portion of gypsum board purchases. Accordingly, any one Defendant seeking to eliminate these competitive price terms by itself would have been met with opposition and likely defections from customers. Only through coordination, therefore, was the reversal and elimination of this long-standing practice possible. Without all of the Defendants eliminating job quote pricing, a Defendant would have lost significant market share to competitors who continued to provide job quotes. The conspiracy, however, allowed the Defendants to effectuate this historically unprecedented change in price structure.

10.     The Defendants also implemented supply restrictions to facilitate the conspiracy's ability to impose and maintain industry-wide price increases. These supply restrictions were put in place even though there was substantial overcapacity in the industry. (In fact, the industry was barely operating at fifty percent of its actual capacity.) It would have been contrary to the unilateral interests of any Defendant to restrict its supply of gypsum board to customers absent

6

the conspiracy because customers would have turned to competing suppliers to meet their needs. Similarly, because of limited demand for gypsum board and substantial overcapacity, no manufacturer could have imposed and maintained large price increases or eliminated longstanding competitive pricing practices such as job quotes in the absence of a conspiracy. Had they tried to do so, customers would have shifted their business to other suppliers.

11.    Defendants had ample opportunity to collude.  The Defendants participate in multiple trade association meetings, including meetings of the Gypsum Association  and the AWCI Industry Executives' Conference.  For example, in mid-September and mid-October 2011, the Defendants attended industry meetings held by these trade groups.

12.    Since these changes were implemented on January 1, 2012, none of the Defendants has sought to eliminate the price increase or reinstitute a job quote policy to gain market share.  Departing from prior practice, Defendants implemented their announced price increases with limited negotiation.  Whereas customers had, in the past, been able to get bids from a variety of manufacturers and play one off of the other, Defendants now limited such competitive activity.

13.    Not only have Defendants maintained their earlier price increases, they have recently announced substantial additional price increases effective January 1, 2013, with the intention of maintaining increased prices throughout 2013.  For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all gypsum board products on January 1, 2013 and that price increase would apply to all work performed in 2013.

- On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line ... by **30%** across the board.  It is once again, our intention that this increase will be good for the entire calendar year of 2013.  In addition, our

7

elimination of the practice of providing job quotes remains in effect and is strictly enforced." (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%. This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year." Certain Teed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant LaFarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our gypsum board products and it intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO Gypsum told its customers that "[e]ffective January 1, 2013, PABCO Gypsum will implement a 30% price increase across all product lines. This increase will establish pricing for the calendar year 2013."

- Defendants USG, Georgia-Pacific and Temple-Inland have also informed customers that substantial price increases will be imposed effective January 1, 2013, that those price increases will remain in effect throughout the year, and that their policy of eliminating job quotes remains in place.

14.   As a result of Defendants' collusion, Plaintiff and all other direct purchasers of gypsum board have paid artificially inflated prices. This action is brought by Plaintiff and the proposed class to secure the relief afforded by the Sherman Act against Defendants' unlawful conspiracy.

## CLASS ACTION ALLEGATIONS

15.   Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Class") consisting of:

> All persons or entities that purchased gypsum board in the United States directly from any of the Defendants, their subsidiaries, affiliates or joint-ventures from January 1, 2012 through the present (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

8

16.     The Class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands of individuals and entities purchased gypsum board from the Defendants during the Class Period.

17.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members share the same injury, as they were all damaged by the actions of Defendants which caused them to pay artificially inflated prices for gypsum board.

18.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

19.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

20.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

- Whether the Defendants engaged in a conspiracy to raise, fix, and maintain prices of gypsum board sold in the United States;

- Whether the Defendants conspired to eliminate the practice of providing job quotes;

- The duration and extent of the conspiracy;

- Whether each Defendant was a participant in any such conspiracy;

- Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

- Whether the conspiracy had the effect of artificially inflating the price of gypsum board sold in the United States during the Class Period;

- Whether the conduct of the Defendants caused injury to Class members; and

- The measure and amount of damages incurred by the Class.

21.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## JURISDICTION AND VENUE

22.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

25.     This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in the Eastern District of Pennsylvania – transacted business, sold gypsum board, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy.  The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in the Eastern District of Pennsylvania. In

addition, Defendant CertainTeed Corporation ("CertainTeed") is headquartered in Valley Forge, Pennsylvania, which is located in this District.

## PARTIES

26.     Plaintiff Sulock Construction, LLC ("Plaintiff") is a Pennsylvania corporation with its principal place of business in Southampton, Pennsylvania.  Plaintiff purchased gypsum board directly from a wholly-owned and controlled USG subsidiary during the Class Period.

27.     Defendant USG Corporation (referred to collectively with United States Gypsum Company as "USG") is a public corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. USG Corporation, through its wholly-owned subsidiaries United States Gypsum Company and L&W Supply Corporation, is a leading manufacturer and distributor of gypsum board.  Defendant United States Gypsum Company is a wholly-owned subsidiary of USG Corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Chicago, Illinois. During the Class Period, USG manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. USG has had the largest market share of any of the manufacturers prior to and during the Class Period.   Specifically, in 2011 USG had approximately 25% of the U.S. sales of gypsum board.

28.     Defendant New NGC, Inc. ("National Gypsum"), commonly known as National Gypsum Company, is a privately-held corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Charlotte, North Carolina. During the Class Period, National Gypsum manufactured and sold gypsum board to purchasers in the United States, including to members of the Class.  In 2011, National Gypsum had approximately 23% of sales of gypsum board in the United States.

29.     Defendant LaFarge North America Inc. ("LaFarge") is a corporation organized, existing, and doing business under the laws of the State of Maryland, with its headquarters in Reston, Virginia. During the Class Period, LaFarge manufactured and sold gypsum board to purchasers in the United States, including to members of the Class.   In 2011, LaFarge had approximately 8% of sales of gypsum board in the United States.

30.     Defendant CertainTeed is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Valley Forge, Pennsylvania. During the Class Period, CertainTeed manufactured and sold gypsum board to purchasers in the United States, including to members of the Class.   In 2011, CertainTeed had approximately 13% of sales of gypsum board in the United States.

31.     Defendant Georgia-Pacific LLC ("Georgia Pacific") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Atlanta, Georgia. During the Class Period, Georgia-Pacific and its subsidiary Georgia Pacific Gypsum LLC manufactured and sold gypsum board to purchasers in the United States, including to members of the Class.   In 2011, Georgia-Pacific had approximately 10% of the sales of gypsum board in the United States.

32.     Defendant American Gypsum Company LLC ("American Gypsum") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters in Dallas, Texas. During the Class Period, American Gypsum manufactured and sold gypsum board to purchasers in the United States, including to members of the Class.   In 2011, American Gypsum had approximately 10% of sales of gypsum board in the United States.

33.     Defendant TIN Inc. d/b/a Temple-Inland Inc. ("Temple-Inland") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its

headquarters in Austin, Texas. During the Class Period, Temple-Inland manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, Temple-Inland had approximately 7% of sales of gypsum board in the United States.

34.    Defendant PABCO Building Products, LLC ("Pabco") is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters in Rancho Cordova, California. During the Class Period, Pabco manufactured and sold gypsum board to purchasers in the United States, including to members of the Class. In 2011, Pabco had approximately 4% of sales of gypsum board in the United States.

35.    The acts taken by Defendants, as alleged herein, were authorized, ordered and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their business affairs.

36.    Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

37.    Defendants' conduct, as described in this Complaint, were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

38.    During the Class Period, Defendants manufactured, sold and shipped gypsum board in a continuous and uninterrupted flow of interstate commerce. The price-fixing conspiracy in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## FACTUAL ALLEGATIONS

### A.    Gypsum Board.

39.    Gypsum board consists primarily of a solid, flat core of gypsum rock sandwiched in between two sheets of linerboard paper. It is commonly called drywall, sheetrock, wallboard or plasterboard. To be considered gypsum board, the core must be predominately gypsum.

40.    Gypsum is one of the most widely used minerals in the world. Although there are two types of gypsum – natural and synthetic – they are chemically identical ($CaSO_4$ $2H_2O$).

41.    Natural gypsum is a mineral mined in 17 states and many parts of the world. In 2010, the leading crude gypsum-producing states were Nevada, Iowa and California.

42.    Gypsum is extracted through mining or quarrying veins of ore that occur close to the surface of the earth. Gypsum deposits lie in flat beds of about six to eight feet in thickness, and are often inter-layered with limestone or shale.

43.    One hundred pounds of gypsum contains approximately 21 pounds of chemically combined water. To drive off the majority of this water and turn the raw product into usable gypsum, it is first crushed into a powder and heated to 350 degrees Fahrenheit. This process is called "calcining."

44.    The powder is made into gypsum board by mixing it with water and other additives and feeding this slurry between layers of paper on a board machine. The paper edges of the board are machine-wrapped as the face and back paper become chemically and mechanically bonded to the gypsum core.

45.    The calcium sulfate then recrystallizes, and the board is cut to length and conveyed through dryers to remove any of the remaining moisture. After the board is dried it is

14

inspected and trimmed again. Individual boards are bound together in pairs in a two-sheet stack called a "book."

46.     Approximately 90% of gypsum mined in the United States is used to produce gypsum board. Of the gypsum board used in construction, half is used in new residential construction. *See Figure 1.* Gypsum board is used in more than 97% of the new homes constructed in the United States and Canada, and an average new American home contains more than 7.31 metric tons of gypsum or, in other terms, more than 6,144 square feet (571 square meters) of gypsum wallboard.



*Figure 1 – Gypsum board use by type. U.S. Gypsum*

47.     Gypsum board is sold in standardized widths, lengths and thicknesses.  One-half inch, 5/8 inch and 5/16 inch are the most common thicknesses, and 12 feet by 4 feet is the most commonly produced size.

48.     Gypsum board differs from products like plywood, hardboard and fiberboard because of the non-combustible core, primarily comprised of fire-resistant gypsum.

**B.     The Gypsum Industry.**

49.     The major manufacturers of gypsum board have annual sales of more than $5 billion dollars.

50.     Most manufacturers of gypsum are vertically integrated, meaning that they participate in each successive step of production, including producing the primary inputs into gypsum board – such as gypsum and paper – and turning these inputs into the finished product.

51.     The products of the Defendants are functionally interchangeable, and the gypsum board produced by one Defendant does not differ significantly in quality, appearance or use from that produced by another Defendant. Gypsum board is produced and sold in standard dimensions.

52.     The Gypsum Association itself describes gypsum board as "*a family* of sheet products consisting of a noncombustible core primarily of gypsum with a paper surfacing or facing." Defendants admit in public filings that gypsum board is more like a "commodity" in that competition is largely based on price, which Defendants recognize is the principal driver of competition.

C.      **Market Characteristics Conducive to Collusion.**

1.      **Sales Of Gypsum Board In The United States Are Conducive To Collusion Because They Are Controlled By Only A Limited Number Of Producers.**

53.     Defendants collectively account for over 99% of the gypsum board sold in the United States and Canada. The three largest Defendants account for more than 60% of the U.S. sales of gypsum board. *See Figure 2.*

| *Manufacturer* | *Market Share 2011* |
|---|---|
| **USG** | 25% |
| **National Gypsum** | 23% |

| | |
|---|---|
| **Saint Gobain/BPB/CertainTeed** | 13% |
| **Georgia-Pacific** | 10% |
| **American Gypsum** | 10% |
| **Lafarge** | 8% |
| **Temple Inland** | 7% |
| **PABCO** | 4% |

*Figure 2.*

54.    The level of concentration set forth above is relatively recent. In the early 1990's there were several smaller manufacturers with only one or two plants and a regional focus. Prior to 2002, investor filings discussed the competition that Defendants experienced from "smaller, regional competitors," but Defendants stopped referring to such competitors after 2002. In fact, in the last 15 years, the number of gypsum board manufacturers has dropped from sixteen to only eight. Sales of gypsum board in the United States are made almost entirely by large corporations each with substantial shares of total sales.

55.    This increased concentration of gypsum board sales facilitated the conspiracy because a potential cartel would need only to conspire with and police a limited number of companies to be successful.   This concentration facilitated not only the fixing of prices but also the coordination of pricing terms (including the elimination of job quote pricing).

      **2.    High Barriers To Entry In The Gypsum Board Market Make The Industry Susceptible To Collusion.**

56.    A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants to the market. Where there are significant barriers to entry, however, new entrants are less likely. With regard to gypsum board

17

sales in the United States, high barriers to entry have prevented new entrants into the market despite the artificial inflation of prices and coordinated elimination of job pricing.

57.     Entry into the gypsum board market involves significant start-up capital expenditures. A new entrant into the business would have to incur tens, if not hundreds, of millions of dollars in costs, including capital expenditures on plants and equipment, regulatory approvals, as well as transportation, electricity, infrastructure for distribution, and labor. The equipment needed to manufacture gypsum board is custom-built and would take several years before it could become operational.   Moreover, because gypsum board manufacturers are vertically integrated, to compete effectively in the market a new entrant would not only have to acquire the means to produce the major inputs into gypsum board, such as access to a limited number of gypsum mines, but would also need to acquire the means to refine these inputs into finished gypsum board, and to place the product into the marketplace. Further, the major manufacturers already maintain networks of distribution centers which not only make products available, but provide advice about the products as well as information about new product developments to customers. This downstream capability is imperative to competing successfully in this industry and would take time as well as capital in order to replicate. As an example of the cost of entering into the market, the purchase of one gypsum line and wallboard plant in Nashville, Arkansas cost $97 million dollars in 1997. And the purchase of Celotex Corporation's gypsum wallboard business cost purchaser BPB P.L.C. $345 million dollars in 2000.

58.     These high barriers to entry helped facilitate Defendants' conspiracy, as they ensured that no new competitors would be able to enter the market to undermine the collusive prices and pricing terms.

### 3. Price Inelasticity For Gypsum Board Makes The Industry Susceptible To Collusion.

59.     When a seller of goods or services can increase prices without suffering substantial reduction in demand, pricing is considered inelastic.  Price inelasticity facilitates collusion, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.

60.     Pricing for gypsum board is highly inelastic in large part because there are no adequate substitutes. Gypsum board is used in virtually all new construction and renovation projects for commercial or residential structures throughout the United States, and because there is no functionally equivalent product, gypsum board must be purchased for these projects.  There are no close substitutes for gypsum board that builders can use as a replacement. This is because gypsum board differs from other construction materials in its composition, functional characteristics, customary uses, and low cost. It is also different from other construction materials such as plaster or lumber because of its ease of application, smooth finish and fire-resistant and moisture-controlling qualities.

61.     A hypothetical small but significant increase in the price of gypsum board by a cartel would not cause a significant number of purchasers to utilize other materials in lieu of gypsum board, nor would such a hypothetical price increase cause so much switching to other products that the increase would be unprofitable.

62.     Because the price for gypsum board is highly inelastic, Defendants were able to collectively raise prices to supra-competitive levels without losing revenues.

19

### 4.   The Defendants Had Many Opportunities To Collude.

63.    The gypsum board industry provides ample opportunities for Defendants to collude and fix the price of gypsum board through trade association meetings and analyst phone calls.

64.    Every Defendant is a member of the Gypsum Association (the "Association"), and most sit on its Board.  The Gypsum Association board of directors for the 2011-2012 term included: Chairman Leo J. Bissonnette from defendant Georgia-Pacific, Past Chairman Stephen Raley from defendant Temple-Inland, First Vice President John K. Donaldson from defendant CertainTeed, Second Vice President Joseph Holmes from USG and Treasurer Craig Robertson from defendant National Gypsum. The board of directors for the current 2012-2013 term include: Chairman Joseph Holmes from USG, Past Chairman Leo J. Bissonnette from defendant Georgia-Pacific, First/ Second Vice Chairman Craig Robertson from defendant National Gypsum, and Treasurer Ryan Lucchetti from defendant Pabco.

65.    The Association was founded in 1930 and in addition to publishing a number of promotional, educational, and technical materials concerning the gypsum industry, it hosts quarterly meetings and a yearly conference, at which the Defendants are regular attendees. Numerous employees of the Defendants, including their CEOs and high ranking executives, attended these meetings, which sometimes feature informal dinners for the competitors at the hotels where they are held.  Each Defendant is also a member of the Association of the Wall and Ceiling Industry ("AWCI").

66.    Trade associations provided an opportunity for Defendants to collude as alleged herein. For example, Defendants attended the annual AWCI Industry Executives' Conference & Committee Meeting over a four-day period in mid-September, 2011 in Coeur d'Alene, Idaho.

Shortly thereafter, the Defendants met in mid-October at the Gypsum Association trade meeting in Las Vegas, Nevada. These industry meetings and others provided opportunities to meet and confer regarding the price of gypsum board, elimination of competitive job quotes, and implementation of the conspiracy described herein.

### 5. The Gypsum Board Industry's History of Collusive Behavior.

67. The Defendants have engaged in similar anticompetitive behavior. In 2002, the European Union fined four gypsum companies $455 million dollars for engaging in a price-fixing scheme for gypsum board and other products between 1992 and 1998. Two of these companies – Lafarge and BPB PLC (which merged with CertainTeed in the United States) – sell in the United States and are Defendants in this action.

68. The gypsum board industry has run afoul of U.S. antitrust laws many times in the past. In *U.S. Gypsum Co. v. National Gypsum Co.*, 333 U.S. 364 (1948), the Supreme Court reversed the dismissal of a Sherman Act complaint against manufacturers of gypsum wallboard, including defendant US Gypsum, finding that there was sufficient evidence to support a finding that the defendants had violated section 1 and 2 of the Act by engaging in a conspiracy to restrain and monopolize interstate trade in gypsum products. Likewise, in *Wall Products Co. v. National Gypsum Co.*, 326 F. Supp. 295 (N.D. Cal. 1971), US Gypsum and National Gypsum, among others, were found to have violated the Sherman Act by combining and conspiring among themselves to stabilize and maintain the price level of gypsum wallboard.

69. Similarly, after a nineteen week trial in the 1970's, six gypsum manufacturers, including defendants US Gypsum, National Gypsum, and Georgia-Pacific, were convicted of criminal antitrust violations in a nationwide conspiracy to fix the price of gypsum board. *United States v. Gypsum Co.*, 438 U.S. 422 (1978). While their convictions were overturned due to

faulty jury instructions, on remand from the Supreme Court, the Third Circuit denied the manufacturers' motion for a judgment of acquittal, finding there was sufficient evidence from which a jury could have concluded the conspiracy violated the Sherman Act. *United States v. United States Gypsum Co.*, 600 F.2d 414, 419-20 (3d Cir. 1979).

**D.**   **The Conspiracy**

70.   Starting in or before September 2011, Defendants engaged in a conspiracy to raise, fix, maintain and or stabilize the price of gypsum board and eliminate a long-standing "job quotes" pricing practice.

**1.**   **Defendants' Price Increases Effective January 1, 2012.**

71.   The price increase in gypsum board announced in the fall of 2011 was the largest in more than a decade. All of the Defendants indicated that this price increase would be implemented on virtually the same date, either January 1 or January 2, 2012. Contrary to prior industry practice, all of the Defendants told customers that the price increase would remain in effect throughout 2012. At the same time, each of the Defendants announced that it was abolishing competitive job quotes.

72.   To announce these drastic changes, the Defendants issued price increase letters or otherwise communicated with their customers in late 2011 setting out these plans. The fall 2011 price increase letters described above included key language describing their actions that was remarkably similar, the effective date for imposition of the price increases was virtually identical, and the duration of the price increases was the same.

73.   These actions were described by one distributor to its customers in December 2011 as follows: "As you are probably now aware, all the drywall manufacturers have revised their pricing strategies beginning in 2012. . . . The manufacturer letters that have been published

22

vary slightly from manufacturer to manufacturer but it amounts to approximately 35% across the gypsum wallboard category."

74.    The Defendants' large spike in gypsum board prices was not in response to – or in expectation of – an increase in demand for gypsum board.   To the contrary, Defendants anticipated flat demand, warning investors in 2012 that "demand for drywall would be no better this year than last." National Gypsum stated that wallboard demand "has been essentially flat and at historically low levels" and projected that the "outlook for the next 12 to 18 months might at best be described as a slow 'climb out.'"   CertainTeed projected in October 2011 that "[t]he housing market is still anemic with little expectation of real improvement in the coming year." Similarly, in October 2011, USG believed that the market is "going to be flat next year."

75.    Prior to the collusive fall 2011 price increase announcements at issue, gypsum board prices had been in a three-month period of decline, falling 0.6% in July 2011, 1.7% in August 2011 and 1.7% in September 2011.

76.    Faced with a weak market with no immediate prospect of rebound, the Defendants nevertheless announced a large spike in the price of gypsum board.  This increase was not supported by competitive conditions and thus could not have been sustained absent the Defendants' agreement to raise prices.

77.    The large 2012 price increase was also not reflective of increased costs of producing and selling gypsum board.  The costs of the major inputs into gypsum board were stable or even falling in the 2011-2012 period.  Moreover, most of the Defendants are vertically integrated companies, and thus have the ability to control to a certain extent the biggest cost inputs of gypsum board – gypsum and paper – because they mine or produce these materials themselves.

78.     Absent collusion, if input costs remain stable or fall and demand is flat, prices would be expected to remain flat or fall as well. The fact that prices rose substantially and for all Defendants in 2012, despite competitive conditions dictating stable or falling prices, is indicative of collusive behavior. Here, Defendants were able to increase prices for gypsum board even in the face of stable input costs and flat demand without fear that their customers could turn to competitors who were selling at a lower price because of their conspiracy as alleged herein.

79.     Moreover, these price increases were imposed at a time when there was substantial overcapacity in the industry. In October 2011, US Gypsum reported that "[c]urrently, there is significant excess wallboard production capacity industry wide in the United States. Industry capacity in the United States was approximately 32.9 billion square feet. We estimate that the industry capacity utilization rate was approximately 52% during the first nine months of 2010. We project that the industry capacity utilization will remain at approximately that level for the balance of 2011." Industry analysts have recognized the downward pressure this creates on pricing noting, for example, that wallboard prices have tended to weaken historically when the industry's rate of capacity utilization has declined below 90%.

80.     Without all of the Defendants implementing significant price increases, each of the Defendant's respective self-interest would have dictated price cutting, or at least price moderation, to undercut their rivals' price increases. If only one or a few of the Defendants had increased their prices in the existing soft market, they would have lost sales, customers and market share to the Defendants who did not raise prices. No one Defendant would have had the leverage to increase prices profitably for gypsum board to this degree absent collusion.

## 2.   Defendants' Elimination of Job Quotes.

81.     Concurrent with the fall 2011 price increase announcements, the Defendants also announced the elimination of the industry's longstanding practice of providing job quotes.  Job quotes – also called price protection – had been a competitive pricing practice in the gypsum board industry for more than four decades.  Job quotes allowed customers to lock in a price for gypsum board (sometimes with specified price increases) supplied throughout the entire course of a construction project.  The abrupt elimination of job quotes by the Defendants represented a fundamental change in this longstanding competitive price practice for the gypsum board industry.

82.     Job quotes are a specific method of quoting prices and have a direct effect on the price of wallboard paid by a customer.  Job quotes are a form of discount that provide direct economic benefits to gypsum board customers for the duration of a construction project.

83.     Until 2011, it was a standard competitive practice in the industry to allow purchasers of gypsum board to negotiate job quotes with the Defendants. Prior to implementation of Defendants' conspiracy, as much as 70 percent of all gypsum board was sold pursuant to a job quote.  One distributor described this price protection practice as "ingrained" in the industry.

84.     The agreement to eliminate this form of price competition facilitated Defendants' tracking and monitoring of cartel members' prices, and thus the enforcement of the conspiracy. The use of job quotes made competitor pricing in the industry relatively opaque.  With job quote pricing in place, it thus would be harder for one cartel member to determine whether a low price given to a particular customer by another cartel member was pursuant to a job quote or was instead a defection from the cartel price.  Without job quotes, Defendants would be much better able to monitor and discipline other cartel members in furtherance of their overall price-fixing

conspiracy. By collectively eliminating this form of price competition, the Defendants ensured that each of them could much more easily, accurately and comprehensively learn each other's prices. Thus, the elimination of job quotes both facilitated the coordinated price hikes and the policing of the conspiracy.

85.    The primary effect of Defendants' agreement to eliminate job quotes was to increase the price of gypsum board. Recent reports have confirmed that the elimination of job quotes coupled with the announcement of a single higher price that will remain in place for the entire year has resulted in a sharp rise in wallboard prices in 2012.

86.    The letters alerting purchasers about the discontinuation of job quotes closely mirrored one another:

- "Our past job quote policy is no longer appropriate as we seek to improve the consistency and administrative efficiency of our pricing policies. In light of the changing market, USG will no longer offer job quotes and/or price protection on wallboard, effective immediately." (USG letter, September 28, 2011)

- "The practice of providing job quotes is broken and counterproductive to meaningful and consistent price management needed to support profitability. Therefore, effective immediately, we will discontinue for all product lines the policy of providing job quotes." (National Gypsum letter, September 30, 2011).

- "In review of our business practices and policies for bringing products to market, we have noted a significant increase in the amount of job quote requests and find the process to be inefficient and administratively burdensome. Accordingly we find it necessary to cease all job quotes immediately." (CertainTeed letter, October 3, 2011).

- "Effective immediately, we will no longer be providing job quotes." (American Gypsum Letter, September 20, 2011).

- "… [E]ffective immediately, we will cease all job quotations." (LaFarge Gypsum Letter, October 4, 2011).

- "Effective immediately, PABCO Gypsum will discontinue the policy of providing job quotes." (PABCO Gypsum Letter, October 12, 2011).

87.     It would have been against the self interest of any one Defendant to eliminate the job quote pricing practice unilaterally.  Absent collusion, any Defendant who was unwilling to offer this competitive pricing term would have lost sales and market share to competitors who continued to offer this price protection to customers.  No one Defendant would have had the leverage to eliminate this form of competition by itself; only by conspiring could Defendants have effectively eliminated this practice.  Thus, the agreement to eliminate job quotes reduces competition between the Defendants.

88.     Since the Defendants announced the discontinuation of job quotes in the fall of 2011, each of the Defendants has continued to make this price protection unavailable to customers.  For example, on September 6, 2012, National Gypsum told customers that "our elimination of the practice of providing job quotes remains in effect and is strictly enforced."  On September 13, 2012, CertainTeed told customers that it "continues our policy of not providing price quotes to customers for specific projects."  The other Defendants have, in like manner, adhered to the elimination of job quotes imposed by all of the conspirators in late 2011.

### 3.     Defendants' Supply Restrictions.

89.     In conjunction with the price increases described herein, Defendants have also imposed restrictions on the supply of gypsum board that will be made available to distributors.  For example, distributors and/or customers were informed by USG, National Gypsum, American Gypsum, Pabco, CertainTeed and Georgia Pacific in or about September 2011, that they were not permitted to purchase supplies of gypsum board that exceeded earlier purchases during the year.  These supply restrictions facilitated the Defendants' ability to impose and maintain the price increases described herein.

90.     To help enforce supply restrictions, Defendants have notified and/or monitored distributors to ensure that they did not build up surplus inventory to circumvent price increases. Pursuant to the conspiracy, Defendants have alerted co-conspirators when a particular distributor appears to be accumulating excess supply and have notified the distributor that its purchases are being monitored.

91.     These supply restrictions have been imposed despite the substantial overcapacity in the gypsum board industry.  As set forth above, and as acknowledged by USG in 2012, the industry's capacity utilization is still at "historically low" levels.

92.     Because of this underutilized capacity, it would have been contrary to the independent interests of any individual Defendant to restrict the supply of gypsum board made available to its purchasers.  If an individual manufacturer withheld supply from a purchaser, the purchaser could – in an unrestrained marketplace – approach competing manufacturers with unused capacity.  Thus, a manufacturer restricting supply to a customer unilaterally would risk not only loss of that specific business, but could also jeopardize the customer relationship by encouraging the customer to do business with a competitor.  The conspiracy, however, has allowed each Defendant to impose large price increases and supply restraints without fear of losing business to its co-conspirators.

### 4.     Defendants' January 1, 2013 Price Increases.

93.     Although demand has modestly improved, Defendants continue to impose price increases that are significantly out of proportion to changes in demand.  The Defendants have recently informed customers that they will impose another round of large price increases.  These increases will again be implemented on the same date (January 1, 2013), and will again remain in place for the same duration (throughout 2013).  For example:

- On August 22, 2012, Defendant American Gypsum told its customers that it would impose a 25% price increase on all gypsum board products on January 1, 2013 and that price increase would apply to all work performed in 2013.

- On September 6, 2012, Defendant National Gypsum told its customers that it "will increase prices on its entire Gypsum Wallboard product line … by **30%** across the board.  It is once again, our intention that this increase will be good for the entire calendar year of 2013.  In addition, our elimination of the practice of providing job quotes remains in effect and is strictly enforced."  (Emphasis in original).

- On September 13, 2012, Defendant CertainTeed told customers that it "will increase price effective with shipments on January 2, 2013 by 30%.  This increase amount will apply to all gypsum board products and is intended to be in effect for the entire year."  Certain Teed also stated that it was continuing "our policy of not providing job quotes to customers for specific projects."

- On October 15, 2012, Defendant LaFarge told its customers that effective January 1, 2013, it would increase the price of all wallboard products by 30% and "[t]his price increase applies to all our gypsum board products and it intended to be in effect for all of 2013."

- On October 24, 2012, Defendant PABCO Gypsum told its customers that "[e]ffective January 1, 2013, PABCO Gypsum will implement at 30% price increase across all product lines.  This increase will establish pricing for the Calendar Year 2013."

- At or about the same time, USG, Temple-Inland and Georgia Pacific have also informed customers that substantial price increases will be imposed effective January 1, 2013, that those price increases will remain in effect throughout the year, and that their policy of eliminating job quotes remains in place.

94.     The Defendants are imposing these additional price increases even though there continues to be substantial overcapacity in the industry.  Absent the conspiracy, it would be contrary to the interest of any Defendant to impose such large increases because of the incentive of other manufacturers with underutilized capacity to undercut such a large price increase.  As USG again acknowledged in April, "there is significant excess wallboard production capacity industry-wide in the United States.  Industry capacity in the United States was approximately

31.9 billion square feet as of January 1, 2012. We estimate that the industry capacity utilization was approximately 54% during the first quarter of 2012 compared to 51% during the first quarter of 2011 and 56% during the fourth quarter of 2011. We project that the industry capacity utilization rate will remain at approximately the current level for the balance of 2012." USG recognized that "such a low level of capacity utilization" puts "pressure on gypsum wallboard selling prices and gross margins."

95.     The Defendants are also maintaining supply restrictions to facilitate the coordinated imposition of another round of large price increases. For example, USG, National Gypsum, American Gypsum, Temple-Inland, Lafarge, CertainTeed and Georgia-Pacific have all begun communicating and imposing supply restrictions limiting the ability of distributors to purchase larger amounts in late 2012. USG has indicated that on or about September 18, 2012, it "put in a controlled distribution policy for our customers" and, as a result, customers "know there's a ceiling on what they can purchase."

96.     During the same time period, the other Defendants have imposed similar supply restraints. The Defendants are imposing those supply restrictions even though they are substantially underutilizing their capacity. Absent the conspiracy, it would not be in the independent interest of any Defendant to impose such a supply restraint unilaterally, because its competitors could gain a significant competitive advantage by providing the gypsum board that is being withheld.

## VIOLATIONS OF THE ANTITRUST LAWS

97.     Beginning by at least September 2011 and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint

of trade to artificially raise, fix, maintain, or stabilize the prices of gypsum board in the United States.

98.     Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of gypsum board sold in the United States.  These activities included:

(a)     participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of gypsum board in the United States;

(b)     agreement during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of gypsum board sold in the United States; and

(c)     agreement during those meetings, conversations, and communications to discontinue the industry practice of providing job quotes, in furtherance of their conspiracy to fix, raise, maintain, or stabilize the prices of gypsum board sold in the United States.

(d)     taking numerous steps, as set forth above, to implement and maintain the conspiracy.

99.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

100.    Throughout the Class Period, Plaintiff and the other Class members purchased gypsum board from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

101.   Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## ANTI-COMPETITIVE EFFECTS

102.   As a result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for gypsum board than they would have paid absent collusion.

103.   Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)   price competition in the markets for gypsum board has been artificially restrained;

(b)   prices for gypsum board sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

(c)   purchasers of gypsum board from Defendants have been deprived of the benefit of free and open competition in the markets for gypsum board.

## CAUSE OF ACTION – VIOLATIONS OF SHERMAN ACT § 1

104.   Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

105.   Beginning in at least September 2011, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

106.   Defendants entered into an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for gypsum board in the United States.

107.   Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to eliminate job quotes in furtherance of their conspiracy to fix, raise, maintain, or stabilize the price of gypsum board.

108.   Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and Class members have paid more for gypsum board than they otherwise would have paid in the absence of Defendants' conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

109.   Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR JURY TRIAL

110.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

111.   Wherefore, Plaintiff demands judgment against Defendants as follows:

a. Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined therein;

b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

c. That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

33

d.  That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

e.  That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

f.  For such other and further relief as is just and proper under the circumstances.

Dated:    April 1, 2013                          Respectfully submitted,

Howard J. Sedran
Austin B. Cohen
Keith J. Verrier
Levin Fishbein Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-592-4663
hsedran@lfsblaw.com
acohen@lfsblaw.com
kverrier@lfsblaw.com

David P. McLafferty, Esquire
McLafferty & Associates, P.C.
923 Fayette Street
Conshohocken, PA 19428
Tel: 610-940-4000
Fax: 610-9404007
dpmclafferty@yahoo.com

34